Good morning. May it please the Court, my name is Pat Brookhauser, with my colleague Matt Monroe, we represent the plaintiff appellants in this case. This is a case where the individual defendants worked for a company called Crop Ventures. They decided when they were leaving to identify the intellectual property of Crop Ventures, they identified a specific method and process for taking information from agricultural implements, storing it in the cloud in an application, being able to access it from mobile devices. They took that method and process when they left, and approximately eight weeks later, they filed patent applications using that method and process that they worked on at Crop Ventures. The plaintiff's appellants are successors to the right of Crop Ventures, and the plaintiff's appellants should have the right to ownership of the Canadian patent and U.S. patent application that resulted from those patent applications that were filed just weeks after the individual defendants left Crop Ventures. If I could turn to our first theory, the first claim that I'd like to talk about is the implied contract claim. That is based on what's called the hired to invent doctrine, and the hired to invent doctrine doesn't require... I can't tell from, I couldn't get out of your briefs, and you can tell me where to look in the record for evidence that supports the claim that any defendant, and especially Neuse, was hired to invent a specific patentable concept or device. Yes, Your Honor. So the doctrine does not depend upon his initial hiring. Don't tell me doctrine. Tell me evidence. Tell me what to read in the record, please. So the two key things are his email that he wrote when he was leaving the company. That is at app 936. That's all? No. That's virtually nothing. Is that July 10 email? That is the July 10 email, Your Honor. And then he's got revision B of a method for taking information from an implement that describes... That's the information. That's not evidence of hired. Hired to invent. Well, that reflects his tasks, Your Honor, and that's the key under the test. The test is not... No, but it has to be more specific, as I understand the authorities. This was specific. If I could back up for a second, Your Honor. The doctrine, the legal test does not require that he initially be hired to do what he ended up patenting. The doctrine, as expounded in Teats, says even if you're hired for general service, if you're given the specific tasks, and his work, as at many startup, migrated over a number of things, but it definitely included... I read Teats, and I think you're overstating it, but even if you're not, where is this coming from? Management or whatever? Well, so the revision B that I cited in the brief, that was right after he started back as an employee. So right away, he's working on solving what was a key problem for the company, which is, how do you get this information off the implements? And his specific task was to do that, and his specific method was to use the object pool information, as we call it, patenting. And that July 10th email talks about mapping the parameters and controls from a virtual terminal. That same language is used in the patent applications that are filed just a few weeks afterwards. But the similarity between those two still doesn't answer the question as to whether he was hired to invent, does it? You focus a lot on that similarity, but I'm not sure I understand the link. Well, the link is, Your Honor, that the hired to invent doctrine focuses not only on what he was initially hired to do, but what he was tasked with doing. And the language from Teat specifically says, even if hired for general service, if you're given a specific task of doing this, that is the company's. Is there a difference, though, between being given a specific task to do something and just ultimately doing something? No, Your Honor. Well, if he had done it on the side, yes, there would be. So Teat says, if you do something on the side, then that would not fall within his hired to invent doctrine. From a non-controlling court, which you would concede that if the doctrine is even recognized, it's not a doctrine in favor. It requires extraordinary circumstances to get this hired to invent when it's not reflected in a contract. I don't think it's viewed with disfavor, Your Honor. You're urging us to have Nebraska adopt it, right? Well, it's an implied contract doctrine. And Nebraska, while they've never considered this, they certainly have well-established implied contract theories. I can't imagine that anyone hired by a high-tech company was not, by your argument this morning, hired to invent whatever he or she comes up with. Well, Your Honor, it would depend upon what they do. If you're hired to work on Gmail and you do something completely unrelated, then you're not. But here the evidence shows that this work on this specific method and process was presented to the CEO, the CEO testified it was in his direction, and the July... Where's that testimony? Your Honor, we've got it cited in the brief. But going back to the July 10th email that confirms it, this is when Nuss is leaving and he says this method is known to Ron, the CEO. And in a crucial admission from the defendants, they have said that that July 10th email, as Nuss was about to leave the company, they say that meant that Kropp Ventures should have patented that method. And that's exactly what they ended up doing a few weeks later. Is it Tatchy? How do you say that last name? Tatchy. Good, I got it right. Now he was hired as an executive and to raise capital, right? He was. And he's not on the email. I'm looking at the email. So you've got no case against him, huh? Well, that was forwarded to him, but it was after he had left. The case against him, Your Honor, is this. His role in the patent application was rather limited. The defendants say what he got, their explanation, and after I answer your question, I'd like to turn to the question of did the invention happen afterwards. But the defendant's explanation for what Tatchy did was he had an increased understanding of what's called common land units, which is a geographic descriptor. And that's tied to legal boundaries. And they say he had an increased understanding that took it beyond legal boundaries. Tatchy was requested to think of patentable ideas. There was an email from Ron Osborne, the CEO, to him saying, we want to try and find patentable ideas. Tatchy responded with an article about common land units, the geographic location, and in that email he said gold mine. There's no explanation from the defendants about why he was doing that. That had nothing to do with raising money. That ties directly to their explanation for what he did in the patent application because that was, as I said, an increased understanding. Implied, in fact, contract says both sides agree to it. It says that there is an implied contract and that is from the objective circumstances. Yeah, but it's a mutual intent to contract. Correct. Nebraska law, sir. Correct. Mutual intent to contract. Boy, that doesn't sound like mutual intent to contract. Well, I think if you say now that the defendants admit that this method, they say, when us was saying should have been done by crop ventures, and Tatchy, if it was in response to a request from Tatchy to Heath Gerlach to identify the intellectual property of crop ventures. So the objective circumstances here show that there was an implied contract. They were all working on the very specific tasks that they patented just a few weeks later. Now, how does this relate to the work that Noose did as an independent contractor some months before he was hired? Well, it is. It's related to it, but it is different, your honor. Noose is He was hired to do something specific and he did it, right? He initially was hired to do work on software for the device to take information off the implement. He then shifted when he came back as an employee the documents revision A and revision B that we cite in the brief of this implement communication and control. Right away when he comes back to work as an employee, that's what he's focusing on because that was the problem. How do you get the information off the implements? And that specific method is what he refers to later when they're trying to identify the intellectual property. No, no, wait a minute. You're saying off the implement two different ways, I think. I didn't mean to, your honor. Well, as an employee, I thought your theory or the fight here is about once the information is off the implement and into the tractor, now you've got to get it to the iPad. Correct. And what he was initially doing is it was device you plug into the tractor or implement to take the information off. Their problem was how to To where? To the cloud. But his initial work was on the device. And what he worked on when he came back as an employee, right away, right away when he came back as an employee, was how do you understand the information? From the cloud to the iPad. How is that a completely different exercise than getting it from the implement to the cloud? Well, they are related, your honor. Then this whole implied contract beginning when he was an employee falls apart. No, your honor. I think he was given the specific task of trying to understand and decode the information. That's what the object pool method that he devised is designed to do to help you decode. They called it in the patent application the Rosetta Stone because the question is when there's this data coming in, how can you decode it and understand it? And that's what he was tasked with trying to do. That's what Revision A and Revision B show. That's what his July 10th email talks about, the mapping, the parameters. That's what they ended up patenting. If I could turn briefly to the defendant's argument that no, this was invented afterwards. During the eight weeks after they left, that's when they came up with the invention. There is no evidence to support that. They have two arguments, both of which relate to items that because it's undisputed were already well known in the industry. Number one, they say that when they were mapping the geographic location, they would not limit themselves to legal boundaries. They could have other information. What about Grady White's deposition? If you read the words of it, doesn't it look like they did it after they left? Well, what he's talking about, your honor, he specifically did not look to see whether what they had done was based on what they had done at Crop Ventures. He testified that he specifically did not look into that question. And what he calls the light bulb actually refers to implement profiles. If you go back and look at the evidence and we cite that in our brief, what he's talking about is the implement profile that was Nuss's work. That's what he worked on when he came back as an employee. But the two things they say that they invented, it's undisputed both of them were common knowledge in the industry. One is that you don't restrict yourself to legal boundaries. The second is when you're plotting the path of equipment, you'd like to know when the equipment isn't running. That's it. That's all they say they invented. They didn't have much time to do it. It was only eight weeks after they left. But it's undisputed that those were common knowledge. So there is no evidence that there was an invention afterward. If I could turn to the duty of loyalty. Even if those were common knowledge, is there anything to the idea that incorporating them into their bigger picture plan was creative? No. No, Your Honor. I appreciate the question because it was just a part of what they call the farming operation land segment. And that was what Heath Gerlach was working on at Crop Ventures which was when you get this data and when you understand it, sort of like with the GPS, what you'd like to do is figure out at what location on your farm were you doing particular information? That was the work that they were doing at Crop Ventures and they added on these commonly known things which is when you're looking at the location don't restrict yourself to legal boundaries and when you're looking at where the equipment goes, be sure you can tell where it worked and where it didn't work. That's all they were adding. They weren't adding anything that was inventive. So there is no evidence that the invention occurred afterward. If I could turn to the express contract Well, I would much find it much more interesting to hear about the trade secret issues. The breach of the duty of loyalty, that's pretty straightforward from the briefs and the case cited. But I don't understand the trade secret stuff and particularly the defense of trade secret act claim at all. Okay. There's one trade secret at issue here and it is the method for taking information Where do I see it written down? It is in our opening brief your honor. Well, I didn't see anything comprehensible, frankly. No, it was it was in our opening brief, your honor. It's where we talk about Aaron Alt's definition and what he is talking about is the specific method that they used for a cloud-based system based on the virtual terminal and task controller technology and it had never been done in that manner. I thought it was widely known in the industry. This is the Jefferson deposition. The Benjamin Jefferson deposition? The task controller and virtual technology terminal technology is widely known. I think I'm quoting widely known in the industry. The virtual terminal and the task controller they're defined in standards. The different thing here was to try and use them as a way to understand the information and put it in the cloud and in his deposition he said that was new to him. Doing that he hadn't seen before. And that's what the trade secret is here is that. Now the trade secret test is lower than the novelty test for patent but it was that idea of having this multi-level system for using the virtual terminal and task controller. The Nebraska Supreme Court says if you can find this stuff out by any means that are not improper, there's no secret. It's a short summary of Nebraska law. It is a short summary. It's a unique trade secrets law. There was an amendment to the Uniform Trade Secrets Act. The way that the court has interpreted that though, if you look at the first express case which is really one of the leading cases. I think that's what I was quoting from. They talk about home pride which is an earlier case and they say they reaffirm home pride and the way they do that is they say if you're known within the company it can still satisfy the Nebraska definition of trade secrets. The Defend Trade Secrets Act doesn't have that limitation your honor. It's the commonly known test but the way the Nebraska Supreme Court has defined that is if you don't know it outside the company and here it was that particular way to try and use the task controller and virtual terminal to decode the information in a multi-level system that was not known and Jefferson Benjamin Jefferson says that in his deposition that he didn't know about that before. Well you just said the Defense of Trade Secret Act has a different definition of trade secret than the Nebraska. How many claims do we have to address to take care of your trade secret part of your case? There are two. There's a Nebraska claim and there's a Defend Trade Secrets claim. What circuit court has ever applied as a freestanding Defense of Trade Secret Act claim that does not track what would otherwise be the state law? Well it's a question of federal law your honor. Of course it is. I asked you what federal circuit, I don't think any circuit court has ever addressed this have they? I don't think they have addressed that your honor. You want us to be a path breaker here and take this very ambiguously drafted statute probably in the middle of the night by some committee staffers and apply it to trump Nebraska trade secret law and give you a cause of action akin to RICO right? No not at all. I don't anything akin to RICO. That's where it's been applied most often. I just am asking for the plain language of the statute to be applied which tracks the uniform Trade Secrets Act and answer anything besides injunctive relief? I think that will be a question on remand if you send it back your honor. I think injunctive relief is likely to be the predominant relief that the court would award. Do you have a legislative history that shows that congress intended to trump state intellectual property law in this way? Yeah they did intend to have a uniform law. They followed the uniform Trade Secret Act definition. In this case I understand your concern. They preempted. They explicitly preempted all state law that isn't the uniform act. They're not preempting it. They certainly are. It is an alternative. You have the state act but you can't ignore the federal act. Ron I'm just about out of my time. Could I reserve the remainder for rebuttal? Okay. Mr. Roth. Thank you your honor. May it please the court. When evaluating the handful of claims that we have left here two consistent themes emerge. First of all there are several independent legal bases on each one of the claims that is left that justify affirmance. And secondly every one of the issues that's involved in this case could have been addressed as Judge Loken indicated through an express contract. And instead here we're dealing with implied causes of action and an attempt to expand tort liability beyond what has been recognized in the case law. And that's especially apparent as the questioning indicated with respect to the implied contract claim this hired to invent doctrine. And the issue that we've got here is as Judge Loken pointed out there isn't evidence in the record to establish that any of these three individuals were hired to invent anything specific. And the specificity of the task that is delegated is the appropriate test as the Teats case and as several of the authorities indicate. But there is an alternative prong or directed to right? That's correct. Hired or directed to? That's correct your honor. They're very weak on the hired how are they on the directed? I agree that there are sort of two paths you can get to it. Somebody can be hired to invent something specific or they can be generally hired and then provided, directed with a specific task. But that's the evidence that's lacking here as well. There's no for example work orders, there's no draft contract language, there's no testimony of conversations where employees were directed to do anything specific whatsoever. So even if we go down that second path, what the district court found appropriately is that there's simply no evidence in the record to support that. Could you infer a direction based on what in fact the employee did? I don't believe so your honor and the reason I say that is because I think then that turns any employment relationship, certainly in the technology sphere, into an implied contract relationship. Because then it turns into sort of an ex-post test, right? We look at what the employee ended up doing and then say well he had to be specifically directed to do that. Because this is an implied cause of action and is an exception to the doctrine that this should be handled through express contracts otherwise, I don't think that's appropriate and I don't think that there's any court that's taken that path. What sort of examples are out there for direction? So I think Teats probably provides the most extensive discussion of this there. General Electric came to the company and said we want you to create a turbine for an engine that has a single leading edge on it. Mr. Teats was hired as the chief engineer for that project and was specifically directed to create that product. Are there any other, do you know of any other cases that give other examples of the kind of direction that maybe is less formal? I would the only case that I can remember the standard auto case dealt with a, but it was a similar sort of a similar formal direction to that where it was like an engineering task to create a specific part and so frankly this isn't a doctrine that's applied a lot I think as all of the case law shows, but here what the district court went back on, and it went through as Judge Benton indicated, this is an individualized analysis as to each specific one of the employees and in the addendum at page 36 and specifically footnote 25, the district court goes through an analysis of each one of these individuals and indicates that there's simply not evidence in the record to establish that they were hired to invent anything at all. Even if we pass that threshold and say that there is an implied contract in some respect, we then have to look at what the invention actually is. And while they now contest that these two on appeal anyway, that these two components were added to and these are what are referred to and I understand that there's a lot of technicalities in the briefing, this is what is referred to as foals and travel path. Those are the two concepts that as the district court says at the addendum at page 37 that Farmers Edge did not seriously dispute the farm mobile defendants evidence that foals and travel path came about after the three individuals left crop ventures. So it was undisputed before the district court and now while it's disputed on appeal, it's too late to do so now. Those were concepts that were added after the fact and as Judge Benton correctly pointed out, the white deposition as well as there's an audio taped recording of the discussions that are happening when this work is taking place to determine what concepts are going to be added to any work that had been previously done. I want to briefly address this argument now that's made on appeal that these concepts aren't novel or they're publicly available. First of all that's not true at all and we can argue until we're blue in the face about whether these are novel ideas but that's a determination to be made in the course of patent litigation not for purposes of an implied contract action. The question is whether what they're seeking title to here, whether that is what took place at the predecessor company or whether it is something different. It has nothing to do with whether it's novel or new. It's whether it's the same thing that they worked on or it's something different and they can't cite you to one case where this doctrine has been applied to obtain title to property something that was created after employees left especially when it is undisputed before the district court that it is different than what was worked on at the original company and in fact the Skycam versus Bennett case which we discuss extensively in the briefing expressly rejects this theory. On the trade secrets claim as counsel pointed out we are left with one trade secret we originally had six trade secrets at issue in this case we also had a dozen claims originally in this case we're now down to six so there are several claims and theories as the court is evaluating the opinion that have been waived on appeal and have now been to final judgment but even with respect to this one trade secret the court's principle holding the district court's principle holding here is that these were nothing more this trade secret was nothing more than an idea or a strategy and was not concrete or particularized enough and as Judge Loken pointed out in the opening brief the trade secret is not defined at all all that we get is a citation to two pages of the expert report and that's what the trade secret is so not only is it undefined before the district court it's undefined before this court until we get to the reply brief and in the reply brief the opening sentence of that section has a one sentence explanation I think of what they believe the trade secret is now and then there's five words of analysis Give them a page that's on them their reply brief I know it's your opponent's brief but I believe it's section five of the brief your honor let me get the page for you it's page 27 your honor so they identify what they claim the trade secret to be again citing back to those two pages and then the analysis is five words it is specific and concrete there's no case analysis there's no citation to law or to the record it's simply an assertion that by their say so it's concrete and particularized What about the next sentence disclosed in defendant's patent documents well and that will get to the defend trade secrets act issue as well your honor but it was not disclosed in the patent documents because it was first of all it's not a trade secret to begin with and secondly the record demonstrated that it was publicly available before this concept was even used in the patent documents to begin with. Is that dispositive then? Are you talking about the disclosure of that? So I think that that is I think what the case law says the disclosure in the patent application is dispositive as to the defend trade secrets act claim. I apologize not in the application but my understanding is that there are one of your your assertions was that there weren't particular efforts to keep this confidential. I agree with that your honor Is that dispositive of the Nebraska claim? I believe it is yes If that's correct I mean if you agree with our position certainly if you agree with our position that they didn't take efforts to keep this information confidential I do think that's dispositive of the claim and I think the case law bears that out and there's two specific ways that they weren't that they didn't keep this information confidential the first is the disclosure that's talked about extensively in the briefing to the third party company called DISTEC and they took this document the document that they keep talking about revision B they took this to that third party they gave them this document and while they were working with them without any confidentiality agreement in place without any non-disclosure agreement in place gave them this document and started working with them their argument now is well there's one employee that testified that he believed that that was confidential Is that Jefferson? That is and first of all that's the wrong analysis because it doesn't matter what the one individual in that third party thought of it the test is whether they took reasonable steps to protect this trade secret and the evidence establishes that they did not but secondly it's wrong on the factual record because what the record indicates is that after after Farmer's Edge refused to pay DISTEC for their services they took this document used it to create a competing product and went to market with that product so the factual record totally belies the argument that this was somehow confidential in DISTEC's position even if you disbelieve the DISTEC theory of why this information was not protected there's the record is replete with more and more evidence of how there were not steps taken at this company to take to protect any information that they deem to be confidential or to otherwise prevent employees from accessing information that they should not and the district court chronicled this in the addendum at page 47 and goes through this full analysis of all of the steps that the crop ventures company failed to take to protect any of this information and the final reason that the trade secrets claim is inactionable is because the district court includes a lot of evidence in the record of how this information was publicly available in the addendum again at pages 17 to 18 they talk about extensive uncontroverted facts that establish that these theories and strategies and ideas that they're attempting to characterize as trade secrets are publicly available and in fact I'm surprised that a little bit that we have the argument here today that these are not publicly available and that these are proprietary and secret when the position that they've taken as the court's aware there's pending litigation on the patent application that they're seeking here right now in Canada and the position that they've taken there is that all of this is publicly available so I don't understand that inconsistency in the positions that they're taking with two separate federal courts but in any event the point for this court on review of this district court record is that there is sufficient evidence in the record to establish that this information is publicly available and as Judge Benton points out correctly so the first express case and several cases in that line of authority established that Nebraska law is unique on this point if the trade secret is quote ascertainable at all through publicly available means then there's no trade secret Are they the only state that added that to the Uniform Act? Didn't most states just pass the Uniform Act like they typically did? I think most states did I don't know the numbers your honor but obviously they are unique and that they did not but I don't know the numbers of states that did and did not Briefly as I mentioned Judge Kelly with respect to the Defend Trade Secrets Act claim I think Judge Loken is right that it has never been applied in this circumstance but I do think that the alleged disclosure of the trade secret in a patent application is dispositive of the trade secrets claim as a matter of statutory interpretation so the question here of course is because that disclosure not only happened but was published by the patent office and the publication is the key because the publication of course makes it public to the whole world so to the extent there's a trade secret there's no longer a trade secret at that point with respect to the Defend Trade Secrets Act claim and that's the Attia versus Google case that we filed a 28J letter on last Friday illustrates and that case is on all fours with this one in that it was a patent application that was published and that act was found to have extinguished any claim under the Defend Trade Secrets Act and I'll mention briefly too the case that they used to respond to that 28J letter it does not involve a disclosure in a patent application that case speaks broader to the idea that there can be a theory of continued use that can give rise to a DTSA claim. We don't dispute that in some circumstances a continued use theory at least some courts have recognized it but none have done so where the disclosure is in a public patent application and then that patent application is published prior to the enactment of the DTSA so that claim fails as well. I think Judge Loken is correct that the express contract and duty of loyalty claims are largely resolvable on the basis of the brief so I'll just mention a couple of quick points with respect to the express contract claim. I think that the timeline as well as the plain language of the agreement defeats any argument that there could be an express contract here. As Judge Loken indicated Mr. Nuss was originally hired or engaged as an independent contractor and at that time he signed this agreement that's in the appendix at pages 920 to 921 there's no survivorship clause in that agreement and everybody agrees both sides agree and the fact is the list of facts is in the appendix at page 23 96 and the admission of those facts is at page 30 31 of the appendix. Everyone admits that this independent contractor relationship to create a prototype for a piece of hardware was completed. Well it is interesting that paragraph 3 delivery of materials upon termination provides as requested by the company from time to time and upon the termination of contractors advisory relationship and or employment with the company. There's an express link to the later employment? Well I think in response I think the problem with that is the gap between the two. I agree and that's where I was going with it. That goes way beyond what's briefed. Well I understand that your honor but it is undisputed that the independent contractor relationship ends and then there's a two month period where he's employed elsewhere and then he's reengaged as an employee, signs an offer letter and there is no reference back to that agreement, there's no specific language in that offer letter. But if he had morphed from a contractor to an employee. I think it's definitely a closer question, absolutely. Although I will say this, if you look at section 6B of that contract as well, section 6B says that there's no right to continued employment and also says that the contract does not quote, otherwise define the terms of contractors employment with the company. So I do think there's, at the very least there's ambiguity there right? Because as an employee reading the plain language of that agreement, I think it's certainly a fair argument that he's under the impression that if I become an employee, this document doesn't govern the terms of my employment. Because the express language says that. But I do think the principle basis here right, as Judge Loken recognized is that there's a gap. It didn't just morph from an independent contractor relationship to employment, it's two totally separate transactions. And in any event, even if there were an express contract in this case, the terms of the provision that's sought to be enforced here, the confidentiality agreement, are unenforceable under Nebraska law. And Farmer's Edge has consistently argued throughout this case that this court should follow one of its prior decisions evaluating Missouri law. But again, that can't be the test here because both the Gaver decision and more specifically the Broccoli decision from the Nebraska Supreme Court, illustrate that it's not just restrictive covenants that are evaluated for whether they're anti-competitive or unfair. It's much broader than that. In fact, in Broccoli, it was in a term in a benefits contract. But the material that was at issue was confidential information. And so the Nebraska Supreme Court has been willing to apply this doctrine much more broadly than the Missouri Supreme Court has. And so even in the event where we do, if we do have an express contract on any of this, then there's simply no reason to enforce this agreement under Nebraska law. They could have included something, some confidentiality limitation that would be enforceable under Nebraska law. Absolutely. It would be narrow and you just can't go and tell everybody what has gone on. I absolutely agree with that, Your Honor. And the problem that the district court found with it here is that the definition of confidential information began with everything not generally known to the public. Well, as engineers in this business, everything they do is not generally known to the public. The vast majority of what they do is not known to the public. And so the clause there was too broad. But yes, of course they could have a narrowly tailored one that would achieve that end. What all of this illustrates is that all of this could have been avoided through express contracts. They chose not to do so. And there's no basis to expand these implied causes of action and the tort theories here beyond what any court has recognized. The district court rightly rejected that and this court should do the same. Mr. Brookhouser for a vote? Yes, Your Honor. First, if I could address the issue of whether the invention was done by the district court, absolutely it was. Addendum 24, the district court talks about them identifying two things and the experts agreeing that those were not novel differences. So it was addressed in the district court. In terms of direction, the testimony of Judge Loken about Osborne directing NUSS is at 820. And the key point there is this isn't done without the CEO's involvement. They were all involving the CEO in this work. It wasn't done on the side. It was the CEO being involved with all of them as part of their work on specific tasks. Thank you. Thank you, counsel. The case has been thoroughly briefed and argued. It raises a lot of complex questions. We'll take it under advisement.